**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dan Frazier, | CV 07-08040-PHX-NVW |
| Plaintiff, | **ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| Patricia J. Boomsma, in her official capacity as the City Attorney of the City of Flagstaff, Arizona; Terence Hance, in his official capacity as the Coconino County Attorney, Arizona; Terry Goddard, in his official capacity as the Attorney General of the State of Arizona; John and Jane Does, 1-50, individually and in their official capacity as city or county attorneys in Arizona; John and Jane Does 51-3551, citizens provided a private right of action against Plaintiff in Senate Bill 1014, | |
| Defendants. | |

Pending before the court is Plaintiff's Motion for a Preliminary Injunction and Expedited Hearing and Order (Doc. # 5). Evidence was received and argument heard on August 23, 2007. The court's findings of fact and conclusions of law follow.

**I.     FINDINGS OF FACT**

Plaintiff Dan Frazier is a peace activist and resident of Flagstaff, Arizona, who owns and operates CarryaBigSticker.com, a website devoted in part to selling t-shirts, buttons, magnets, and bumper stickers expressing views on a variety of political topics. Frazier has sold these items online for several years to customers throughout the United States to

1    promote his political views and to "change the policies of the Bush Administration relating
2    to the war in Iraq."  The sales generated by CarryaBigSticker.com are Frazier's primary
3    source of income.

4        Among the items for sale on CarryaBigSticker.com are three t-shirts that contain
5    antiwar messages.  The words "Bush Lied" and "They Died" are printed respectively on the
6    front and back of one shirt in large, capital, bold-faced type over a background consisting of
7    the names of 3,461 deceased soldiers.  The names are printed in a small font approximating
8    the size of newsprint and, according to text printed across the top of the t-shirt, represent
9    "U.S. troops who died in Iraq from March 20, 2003 to October 23, 2006."  Frazier's two
10   other antiwar t-shirts read, "Support Our Remaining Troops – Bring the Rest Home Alive"
11   and, quoting Rudyard Kipling, "If Any Question Why We Died, Tell Them, Because Our
12   Fathers Lied."  These expressions are also printed in large, capital, bold-faced type over the
13   names of the deceased soldiers.  Frazier created the t-shirts to "underscore and symbolize the
14   significant loss of life and the harm done by the Iraq war." He donates a portion of the
15   proceeds from their sale to charities that provide support to the families of soldiers killed in
16   Iraq.

17       CarryaBigSticker.com advertises the t-shirts as "Anti-War T-Shirts featuring the
18   names of 3,461 troops who died in Iraq."  Alternating images of one t-shirt make visible from
19   the website the words, "Bush Lied – They Died," and the names of several soldiers who lost
20   their lives in the war.  These images are captioned with a statement that the shirts are "illegal
21   in five states and could soon be illegal nationwide[, a]s seen on CNN, NPR, USA Today, and
22   of course, FOX-News."  Below this description are advertisements for a series of other
23   antiwar products, including stickers that read, "Support our Troops Bring them Home" and
24   "War is Not Pro-Life."  The website also contains an "Open Letter to Families of the Fallen"
25   in which Frazier explains his decision to sell the antiwar t-shirts as an outgrowth of his
26   personal views on the war.

27       Frazier uses CarryaBigSticker.com as a vehicle to advance his political views in a
28   variety of ways unrelated to the sale of merchandise.  Some postings on the website reflect

an effort to organize and document a local antiwar movement with photographs and commentaries by Frazier and other like-minded individuals.  Other postings variously critique the Iraq War as a "tragedy," criticize President George W. Bush for being "willing to tolerate torture," relay news accounts concerning the suffering of Iraqi civilians, and promote original political satire.

Frazier is not the first to use the names of the soldiers who have died in Iraq to document or comment on the war.  The Pulitzer Prize for editorial cartooning was awarded to the cartoonist Mike Luckovich in 2006 for a drawing that used the names of the deceased soldiers to spell the word, "Why," followed by a question mark.  A May 30, 2004 Doonesbury cartoon that is sold commercially depicts a soldier placing his hand on the helmet of a fallen comrade and a memorial listing the names of all of the soldiers who had died in the war up to that point.  Lists of the soldiers' names are also available publicly on websites such as CNN.com and WashingtonPost.com.

Because of his antiwar t-shirts, Frazier has received numerous complaints in recent years from family members of soldiers who have died in Iraq.  Approximately a dozen of these individuals have threatened to sue Frazier if he does not stop using the names of the fallen soldiers on the t-shirts.  Several complained to the Arizona State Legislature and Governor in an effort to halt the sale of the disputed items.

As a direct result of these complaints, the Arizona Legislature passed Senate Bill 1014, effective May 24, 2007, which provides civil and criminal penalties for certain unauthorized uses of the name of an American soldier.  2007 Ariz. Sess. Laws ch. 227 (codified at A.R.S. §§ 12-761, 13-3726).  The section pertaining to civil liability is codified at A.R.S. § 12-761 and provides as follows:

> A.    The right to control and to choose whether and how to use a soldier's name, portrait or picture for commercial purposes is recognized as each soldier's right of publicity.
>
> B.    A person is liable for using the name, portrait or picture of any soldier without having obtained prior consent to the use by the soldier or by the soldier's spouse, immediate family member, trustee if the soldier is a

minor or legally designated representative if the person uses the name, portrait or picture for any of the following purposes:

     1.     Advertising for the sale of any goods, ware or merchandise.

     2.     Soliciting patronage for any business.

     3.     Receiving consideration for the sale of any goods, wares or merchandise.

C.     A person who uses the name, portrait or picture of a soldier for a prohibited purpose without prior consent from the soldier or a person who may enforce the soldier's rights and remedies is subject to the following:

     1.     Injunctive relief to prevent or restrain the unauthorized use.

     2.     Treble damages.

     3.     Punitive or exemplary damages.

     4.     Attorney fees and costs.

D.     In calculating damages, any profits from the unauthorized use that are attributable to that use shall be taken into account.

E.     The rights and remedies provided in this section supplement any other rights and remedies provided by law, including the common law right of privacy.

F.     Any claim for relief that is requested pursuant to this section shall be brought within five years after the unauthorized publication.

G.     The right of publicity is a property right that survives a soldier's death. On the soldier's death, only the following individuals may enforce the soldier's rights and remedies in the following order:

     1.     The soldier's legally designated representative.

     2.     The soldier's spouse.

     3.     The soldier's parents.

     4.     The soldier's children.

     5.     The soldier's grandchildren.

H.     This section does not apply to the following:

1.  The use of a soldier's name, portrait or picture in an attempt to portray, describe or impersonate that soldier in a live performance, a single and original work of fine art, a play, book, article, musical work or film or on radio, television or other audio or audiovisual work if the performance, musical work, play, book, article or film does not itself constitute a commercial advertisement for any goods, wares or merchandise.

2.  The use of a soldier's name, portrait or picture for noncommercial purposes, including any news, public affairs or sports broadcast or account.

3.  The use of a soldier's name in truthfully identifying the soldier as the author of a particular work or program or as the performer in a particular performance.

4.  Any promotional materials, advertisements or commercial announcements for a use described in paragraph 1, 2, or 3 of this Subsection.

5.  The use of photographs, video recordings and images by a person, firm or corporation practicing the profession of photography to exhibit, in or about the professional photographer's place of business or portfolio, specimens of the professional photographer's work, unless the exhibition is continued by the professional photographer after written notice objecting to the exhibition by the portrayed soldier or a person who may enforce the soldier's rights and remedies.

6.  A soldier's picture or portrait that is not facially identifiable.

7.  A photograph of a monument or a memorial that is placed on any goods, wares or merchandise.

I.  For the purposes of this section, "soldier" means any active duty member or former member of the armed forces of the United States, including any member who was killed in the line of duty.

The section providing a criminal penalty is codified at A.R.S. § 13-3726 and reads:

A.  A person shall not knowingly use the name, portrait or picture of a deceased soldier for the purpose of advertising for the sale of any goods, wares or merchandise or for the solicitation of patronage for any business without having obtained prior consent to the use by the soldier or by the soldier's spouse, immediate

family member, trustee if the soldier is a minor or legally designated representative.

B.    Any person who is injured by the use of the name, portrait or picture of a deceased soldier in violation of Subsection A of this Section may bring a civil action against the person who committed the violation pursuant to Section 12-761.

C.    This Section does not apply to the following:

    1.    The use of a soldier's name, portrait or picture in an attempt to portray, describe or impersonate that soldier in a live performance, a single and original work of fine art, a play, book, article musical work or film or on radio, television or other audio or audiovisual work if the performance, musical work, play, book, article or film does not itself constitute a commercial advertisement for any goods, wares or merchandise.

    2.    The use of a soldier's name, portrait or picture for noncommercial purposes, including any news, public affairs or sports broadcast or account.

    3.    The use of a soldier's name in truthfully identifying the soldier as the author of a particular work or program or as the performer in a particular performance.

    4.    Any promotional materials, advertisements or commercial announcements for a use described in paragraph 1, 2 or 3.

    5.    The use of photographs, video recordings and images by a person, firm or corporation practicing the profession of photography to exhibit, in or about the professional photographer's place of business or portfolio, specimens of the professional photographer's work, unless the exhibition is continued by the professional photographer after written notice objecting to the exhibition by the portrayed soldier or a person who may enforce the soldier's rights and remedies.

    6.    A soldier's picture or portrait that is not facially identifiable.

    7.    A photograph of a monument or a memorial that is placed on any goods, wares or merchandise.

D.    A person who violates this section is guilty of a Class 1 misdemeanor.

E.   For the purposes of this Section, "soldier" means any active duty member or former member of the armed forces of the United States, including any member who was killed in the line of duty.

The law also provides for severability. "If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application." 2007 Ariz. Sess. Laws ch. 227, sec. 3.

Several other states recently have enacted legislation with varying degrees of similarity. *See* Fla. Stat. § 540.08(3) (Florida); La. Rev. Stat. Ann. § 14:102.21 (Louisiana); Okl. Stat. Ann. tit. 21, § 839.1A (Oklahoma); Tex. Bus. & Comm. Code Ann. § 35.64 (Texas). Federal legislation is currently pending before the United States Senate. *See* Soldiers Targeted by Offensive Profiteering Act of 2007 ("STOP Act"), H.R. 269, 110th Cong. (2007).

Police officers in Flagstaff contacted Frazier to notify him of the new Arizona law one month after its enactment. The officers advised him that they were preparing a report for the Flagstaff City Attorney's Office that could result in criminal charges under A.R.S. § 13-3726. In an effort to prevent action against him, Frazier brought this action and now moves for a preliminary injunction prohibiting the enforcement of sections 12-761 and 13-3726 against him for sale and advertising of the antiwar t-shirts. He contends that such an application of the statutes would violate his right to free speech under the First and Fourteenth Amendments of the United States Constitution.

Frazier continues to sell and advertise his t-shirts notwithstanding the new law. Although the controversy surrounding the merchandise has boosted sales, Frazier does not have significant financial resources and anticipates that the cost of defending against actions or prosecutions under A.R.S. §§ 12-761 or 13-3726 will cause him serious financial hardship. The Flagstaff City Attorney admitted in her answer that "the Bill prohibits [Frazier's] selling of T-shirts containing the names of soldiers killed in the Iraq war without authorization." The Arizona State Attorney General, Flagstaff City Attorney, and Coconino County Attorney

1   also admitted in their answers that in conducting his activities, Frazier "subjects himself to

2   risk of . . . criminal penalties." However, at oral argument on August 23, 2007, the Arizona

3   Attorney General appeared to concede that A.R.S. § 13-3726 does not reach Frazier's

4   conduct. (Prelim. Inj. Hr'g Tr. 85–86, 99, Aug. 23, 2007.) In fairness, that concession was

5   based in part on a misunderstanding, shared by the court as well, that Frazier's website does

6   not advertise the t-shirts with legible names of any soldiers. In fact it does. The Flagstaff

7   City Attorney appeared to make a similar concession. (Prelim. Inj. Hr'g Tr. 99.)

8   **II.   CONCLUSIONS OF LAW**

9         **A.   Frazier's Failure to Serve Any Defendant Capable of Enforcing the Civil
10              Remedy Statute, A.R.S. § 12-761, Precludes Adjudication of the
                Constitutionality of that Statute on this Motion**

11        Federal Rule of Civil Procedure 19(a) provides in part that a "person who is subject

12   to service of process and whose joinder will not deprive the court of jurisdiction" must be

13   joined as a party in an action through proper service of process if "the person claims an

14   interest relating to the subject of the action and is so situated that the disposition of the action

15   in the person's absence may . . . as a practical matter impair or impede the person's ability

16   to protect that interest." The Rule envisions the joinder of those persons whose participation

17   in a legal action is both "feasible" and "desirable in the interests of just adjudication." *EEOC*

18   *v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005).

19        Frazier's Complaint named as defendants "John and Jane Does 51-3551, citizens

20   provided a private right of action against Plaintiff in Senate Bill 1014." However, he has not

21   served process on any such persons. To this point, he has only served process on the

22   Flagstaff City Attorney, the Coconino County Attorney, and the Attorney General.

23        The mere naming of persons as defendants who might bring civil actions against

24   Frazier is not enough under Rule 19(a). Frazier must serve process on at least one individual

25   who is likely to file a civil action against him under A.R.S. § 12-761. Such joinder is

26   feasible. Frazier is aware of approximately a dozen people who lost loved ones to the Iraq

27   war and threatened to sue him because of the t-shirts. One individual who lost her son

28   publicly testified before the Arizona Legislature concerning her objection to Frazier's

1    activities.  Although Frazier may prefer to avoid serving process upon them out of sensitivity

2    to their suffering, he could serve them with process if he chose to do so.

3            Joinder is also desirable in the interests of just adjudication.  Members of military

4    families who have threatened civil actions against Frazier have an obvious interest in the

5    subject matter of this dispute.  Frazier's request for a preliminary injunction against the

6    application of section 12-761 would, if successful, directly impair their interests by

7    precluding them from asserting the statutory cause of action.  They should be brought before

8    the court before it decides whether to restrain their conduct.

9            The constitutionality of A.R.S. § 12-761 therefore cannot be adjudicated unless

10   Frazier properly joins at least one individual who might file a civil action against him.

11   Because service of process must be made "within 120 days after the filing of the complaint,"

12   Fed. R. Civ. P. 4(m), and the Complaint was filed on June 28, 2007, Frazier has until October

13   26, 2007, to accomplish this task.  If he chooses not to do so, his action will be dismissed

14   with respect to all unserved Defendants after that date.  *Id.*

15           **B.      Standing and Justiciable Controversy**

16           Frazier alleged the existence of a case or controversy in his complaint, and Defendants

17   have denied that allegation in their answers.  Though no party has briefed the issue, the court

18   proceeds on its own to examine the justiciability of Frazier's suit because of its duty to heed

19   its jurisdiction.  *See Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1106 n.4 (9th Cir.

20   2006) ("[S]ince standing is an aspect of subject matter jurisdiction, the district court [is] free

21   to reach the issue *sua sponte*.").  Unless the plaintiff is confronted with "a concrete and

22   particularized injury that is either actual or imminent," a federal court is without jurisdiction.

23   *Massachusetts v. EPA*, 127 S.Ct. 1438, 1453 (U.S. 2007); *cf. Poe v. Ullman*, 367 U.S. 497,

24   508 (1961).

25           The court later holds that Frazier has proven a "sufficient threat of irreparable harm"

26   to obtain a preliminary injunction.  *See* discussion *infra* Part E.  That holding necessarily

27   satisfies the requirement of a justiciable "case or controversy" under Article III of the

28   Constitution.  However, even absent a sufficiently compelling case for interim injunctive

1    relief, there can still be sufficient injury to create a case or controversy under Article III.

2    *Yniguez v. Mofford*, 730 F. Supp. 309, 317 (D. Ariz. 1990) *rev'd on other grounds*, 939 F.2d

3    727 (9th Cir. 1991) ("While Yniguez has established a sufficient threat of enforcement to

4    provide an actual controversy for purposes of Article III and the Declaratory Judgment Act,

5    she has not established an enforcement threat sufficient to warrant injunctive relief."). *See*

6    *also Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir. 2004) ("Even if we are wrong to suppose

7    the risk of prosecution too remote to confer standing to sue . . . the district judge was right

8    not to enter an injunction . . . . [A]n injunction is an extraordinary remedy); *Alliance of Auto.*

9    *Mfr. v. Hull*, 137 F. Supp. 2d 1165, 1169, 1173 (D. Ariz. 2001) (holding that the plaintiffs

10   had sufficiently alleged that they "are engaging in conduct which may be prohibited . . . to

11   satisfy the Article III 'case or controversy' requirement" but denying a preliminary injunction

12   for lack of a showing of irreparable harm because exceptions within the statute "appear[] to

13   preclude plaintiffs from making a successful argument . . . that their [activities] will be

14   affected.").

15          For a case or controversy to exist under Article III, the plaintiff must have standing

16   to assert his legal claims and those claims must be ripe for review. *Renne v. Geary*, 501 U.S.

17   312, 320 (1991).  Frazier's case meets both of these requirements.

18                          **1.**      **Standing**

19           For standing a plaintiff must have suffered an "injury in fact," there must be "a causal

20   connection between the injury and the conduct complained of," and it must be likely that the

21   injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S.

22   555, 560–61 (1992) (internal citation and quotation marks omitted).  In essence, Frazier's

23   claimed injury is the threat and fear of prosecution for advertising and selling his t-shirts,

24   with the concomitant risk of multiple and potentially ruinous criminal penalties for each

25   violation.  Because it is clear that the State's statute is causing this risk and fear, and because

26   an injunction would suspend the threat, the only real issue for standing is whether Frazier is

27   actually suffering any threat.

28

"The Supreme Court has dispensed with rigid standing requirements" in free speech cases. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citing *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). *See also Alaska Right to Life Political Action Comm. v. Feldman*, No. 05-35902, 2007 U.S. App. LEXIS 22523, at *25 (9th Cir. Sept. 21, 2007). To establish an injury in fact when bringing a pre-enforcement challenge to a penal law based on the First Amendment, the plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Rather, the plaintiff must demonstrate first that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and second that "there exists a credible threat of prosecution thereunder." *Id.*

In other words, the plaintiff must have "an actual and well-founded fear that the law will be enforced against [him]." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). When First Amendment rights are implicated, such a fear of prosecution may "only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Cal. Pro-Life Council, Inc.*, 328 F.3d at 1094 (citing *Am. Booksellers Ass'n*, 484 U.S. at 392). To evaluate the credibility of a threat of prosecution, courts look to 1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," 2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and 3) "the history of past prosecution or enforcement under the statute." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).

Applying these considerations to Frazier's case, the court concludes that Frazier's activities are political speech protected by the First Amendment. *See* discussion *infra* Part D.1. Though the legislature's intent to prohibit his conduct is beyond question, there is question about whether Frazier's conduct comes within the statute's reach as drafted. At the preliminary injunction hearing the Flagstaff City Attorney and the Attorney General stated that the statute may not reach his conduct. Specifically, the language of section 13-3726 may

- 11 -

not apply to Frazier's t-shirts because they may not be "advertising" for a product, but rather the products themselves.  The sale of the t-shirts may not be "solicitation of patronage" for a business, but rather the business itself.  A.R.S. § 13-3726(A) prohibits Frazier's visible use of the names of deceased soldiers in advertising his t-shirts and soliciting patronage through his website, but several exceptions might shield him from liability under that provision as well.  Frazier's t-shirt might be a "memorial" to the soldiers within the exception in section 13-3726(C)(7), or a "news, public affairs . . . account" of the U.S. troops who died in Iraq from March 20, 2003, to October 23, 2006, within the exception of section 13-3726(C)(2).

Nevertheless, that the scope of the statute ultimately may prove not to reach Frazier does not oust a case or controversy under Article III of the Constitution.  The requirement of injury in fact is met where "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Am. Booksellers Ass'n*, 484 U.S. at 392 (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976)); *Cal. Pro-Life Council, Inc.*, 328 F.3d at 1094 (In the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech *arguably* falls within the statute's reach.") (emphasis added); *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) ("But while there may be other, perhaps even better [constructions of the disputed statute], [plaintiff's] is reasonable enough that it may legitimately fear that it will face enforcement of the statute by the State.").

This test of arguable application is met in this case.  The plain purpose of the legislation was to proscribe Frazier's t-shirts and the prosecutor-Defendants originally acknowledged that Frazier's conduct subjects him to the risk of criminal prosecution under the statute.  The court cannot conclude, based on its own reading of the statute, that it "clearly fails to cover his conduct." *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004) (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)).  Moreover, the court is unsure about the stability of the Attorney General and Flagstaff City Attorney's comments, and those comments do not fully dispel the implication that the statute arguably applies to Frazier.  Nor can the court say that their comments rise to the level of a disavowal of

1    prosecution. Where the government "refuses to rule out use of the challenged provision,

2    [that] failure to disavow 'is an attitudinal factor the net effect of which would seem to impart

3    some substance to the fears of [plaintiffs].'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir.

4    2000) (quoting *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501,

5    508 (9th Cir. 1991)).

6         Even where an attorney general states that the State has no present intent to prosecute

7    an individual due to his understanding of the scope of a disputed statute, courts have been

8    reluctant to find the absence of standing because the attorney general does not bind the state

9    courts, local law enforcement authorities, subsequent attorneys general, or even his own

10   future actions. *Bland v. Fessler*, 88 F.3d 729, 737 n.12 (9th Cir. 1996) ("It is true that [the

11   Senior Assistant Attorney General] declared that the Attorney General's office 'has not

12   brought or indicated that it would bring any action' under the civil statute. However, this is

13   far short of a disavowal of enforcement. There is little comfort in these words."); *Vt. Right

14   to Life Comm.*, 221 F.3d at 383 ("[T]here is nothing that prevents the State from changing

15   its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it

16   asserts in this litigation."); *Citizens for Responsible Gov't State Political Action Comm. v.

17   Davidson*, 236 F.3d 1174, 1192–93 (10th Cir. 2000) ("Throughout this litigation, Colorado

18   has insisted that under the State's construction of [the statute], organizations like [the

19   plaintiffs] will not be prosecuted . . . . Such representations, however, are insufficient to

20   overcome the chilling effect of the statute's plain language."); *Deida v. City of Milwaukee*,

21   192 F. Supp. 2d 899, 909 (E.D. Wis. 2002) ("At present, no State Defendant has said

22   explicitly to plaintiff or to this court that it will not enforce [the statute] against her . . . [and]

23   even if the State Defendants do not intend to enforce the statute today, nothing prevents them

24   from deciding to enforce it tomorrow."). *Cf. Am. Booksellers'*, 484 U.S. at 395 ("[A]s the

25   [State] Attorney General does not bind the state courts or local law enforcement authorities,

26   we are unable to accept her interpretation of the law as authoritative.").

27        On the other hand, there may be no credible threat of prosecution where prosecutors

28   have provided direct assurances that the plaintiff will not be prosecuted and other

circumstances adequately assure the court that the disavowal of prosecution is genuine and lasting. *See, e.g., Winsness v. Yocom*, 433 F.3d 727, 731; 733 (10th Cir. 2006) (dismissing action where the district attorney and assistant district attorney submitted affidavits stating "I have no intention of prosecuting [the plaintiff] or anyone else under the statute" and where a recent Supreme Court decision had held unconstitutional a similar statute from another state); *Lawson*, 368 F.3d at 956–57 (dismissing action where the County prosecutor had expressly instructed local law enforcement not to pursue investigations against the plaintiff or other anti-war protesters under the statute); *Wis. Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1185 (7th Cir. 1998) (dismissing action where the state enforcement agency promulgated a rule stating that it would not enforce the statute against groups like plaintiff).

Frazier's case falls on the standing side of the boundary drawn by these precedents. An expression of the government's present interpretation of the statute is not the kind of direct assurance, backed up by affirmative action or other circumstantial guarantee, required to dispel the cloud that currently hangs over Frazier's constitutional right to free speech. The Coconino County Attorney, who was absent from the hearing, may consider the statute applicable, and the Attorney General or the City Attorney's interpretation of the statute may again change with further analysis.

Frazier has also gone beyond articulating a concrete plan to violate the statute; he has sold and continues to sell the t-shirts, despite having been warned by the police of criminal investigation. His complaint alleges more than a "generalized threat" of prosecution; it alleges "a specific warning of an intent to prosecute under a criminal statute[, which] suffice[s] to show imminent injury and confer standing." *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (citing *Steffel*, 415 U.S. at 459). The lack of a history of prosecutions under the statute results from the fact that it is new and was passed specifically for Frazier. The threat of prosecution against Frazier is therefore sufficient for standing to challenge the statute by this action.

1

### 2.    Ripeness

2          The *Babbit* test for determining injury in fact, and our circuit's interpretation of it in

3    *Thomas*, also comprise the constitutional component of ripeness analysis for First

4    Amendment pre-enforcement challenges to penal statutes. *Cal. Pro-Life Council, Inc.*, 328

5    F.3d at 1093; *Thomas*, 220 F.3d at 1139.  Having concluded that Frazier has satisfied the

6    requirement to show injury in fact, the court need only address the prudential aspects of

7    ripeness.  Prudential ripeness requires the court to consider "the fitness of the issues for

8    judicial review and the hardship to the parties of withholding court consideration." *Thomas*

9    at 1141 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

10         Frazier asks the court to preliminarily enjoin the State from prosecuting him for

11   advertising and selling his t-shirts.  He has already created and sold the t-shirts and posted his

12   advertisements.  This supplies the "concrete factual situation . . . [necessary] to delineate the

13   boundaries of what conduct the government may or may not regulate." *San Diego County*

14   *Gun Rights Comm.*, 98 F.3d at 1127.  The delay would put the court in "no better position

15   later than [it is] now" to decide the claims presented because the court requires no better

16   factual record to decide the issues. *Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438

17   U.S. 59, 82 (1978) (quoting *Blanchette v. Conn. Gen. Ins. Co.*, 419 U.S. 102, 143–45 (1974)).

18   To delay adjudicating Frazier's claim would force him to stop selling his t-shirts or risk

19   cumulation of criminal penalties.  Frazier's case therefore presents a controversy ripe for

20   review.

21

### C.    Standard for Preliminary Injunction

22         "[A] preliminary injunction is an extraordinary and drastic remedy, one that should

23   not be granted unless the movant, by a clear showing, carries the burden of persuasion."

24   *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (quoting 11A CHARLES

25   ALLEN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND

26   PROCEDURE § 2948 (2d ed. 1995)).  The moving party must demonstrate either "(1) a

27   combination of probable success on the merits and the possibility of irreparable harm; or (2)

28   that serious questions are raised and the balance of hardships tips in its favor." *Faith Ctr.*

1  *Church Evangelistic Ministries v. Glover*, 462 F.3d 1194, 1201–02 (9th Cir. 2006) (internal

2  quotation marks omitted) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013

3  (9th Cir. 2001)).  These formulations are not different tests but rather "two points on a sliding

4  scale."  *Id.* at 1202 (quoting *Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity*,

5  950 F.2d 1401, 1410 (9th Cir. 1991)).  "[T]he required degree of irreparable harm increases

6  as the probability of success decreases."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,

7  1013 (9th Cir. 2001) (quoting *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204

8  F.3d 867, 874 (9th Cir. 2000)).

9  For First Amendment claims, our circuit has held that "if the movant has a 100%

10  probability of success on the merits, this alone entitles it to reversal of a district court's denial

11  of a preliminary injunction, without regard to the balance of the hardships."  *Faith Ctr.*

12  *Church Evangelistic Ministries*, 462 F.3d at 1202 (quoting *Sammartano v. First Judicial Dist.*

13  *Ct.*, 303 F.3d 959, 965 (9th Cir. 2002)).  *Cf. Baby Tam & Co., Inc. v. City of Las Vegas*, 154

14  F.3d 1097, 1102 (9th Cir. 1998) ("Baby Tam has a 100% probability of success on the merits

15  . . . .  [It] is entitled to a permanent injunction prohibiting the City from enforcing the

16  ordinance in its present form.").  Because the needed probability of success and degree of

17  harm vary inversely, both must be examined to say whether a case is made for preliminary

18  injunction.

19    **D.** **Criminal Prosecution for Advertizing and Selling His T-Shirts Would**
    **Violate Frazier's Free Speech Rights**

20

21     **1.** **Frazier's T-Shirts and Corresponding Advertisements Are Political**
     **Speech**

22  The First Amendment reflects a "profound national commitment to the principle that

23  debate on public issues should be uninhibited, robust, and wide-open."  *N.Y. Times Co. v.*

24  *Sullivan*, 376 U.S. 254, 270 (1964).  "[T]he freedom to speak one's mind is not only an aspect

25  of individual liberty–and thus a good unto itself–but also is essential to the common quest for

26  truth and the vitality of society as a whole."  *Bose Corp. v. Consumers Union of U.S., Inc.*,

27  466 U.S. 485, 503–04 (1984).  Laws that restrict political speech based on content are

28  therefore subject to strict scrutiny and are unconstitutional unless they are "necessary to serve

a compelling state interest and . . . [are] narrowly drawn to achieve that end." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  Whether a law is narrowly drawn depends on the "fit" between the scope of the restriction it imposes and the interests that justify its enactment. *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 577 (9th Cir. 1993) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)).  A content-based restriction must use the "least restrictive means to further the articulated interest," *Foti*, 146 F.3d at 636, and must actually advance the interest, *see Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1011–12 (9th Cir. 2003).  The restriction will fail to pass constitutional muster if it either reaches speech that does not implicate the articulated interest or fails to reach speech that actually does implicate the interest. *See id.* at 1012–13.

Restrictions on speech are not always subject to strict scrutiny, however.  A law that regulates commercial speech based on content will be constitutional so long as it "directly advances" a "substantial" governmental interest and is no more extensive than is necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).  Likewise, regulations pertaining exclusively to the time, place, or manner in which speech may take place are permissible as long as they are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

The State contends that the application of A.R.S. § 13-3726 should be evaluated deferentially because Frazier's speech is commercial in nature.  This argument cannot be squared with settled case precedent.  The commercial or political character of speech "depends upon the nature of the speech taken as a whole." *Gaudiya Vaishnava Soc'y v. City of San Francisco*, 952 F.2d 1059, 1064 (9th Cir. 1991) (citing *Bd. of Trs. v. Fox*, 492 U.S. 469, 473–474 (1989)).  Speech will be considered commercial in nature only when it is "purely commercial," *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002), in that it does no more than "propose a commercial transaction." *Bolger v. Youngs Drug*

1   *Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation omitted).   Commercial speech that is

2   inextricably "intertwined with informative and perhaps persuasive speech seeking support for

3   particular causes or for particular views on economic, political, or social issues," by contrast,

4   is treated as political speech and is fully protected by the First Amendment.   *Village of*

5   *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980).   Thus, the "sale of

6   merchandise which carries or constitutes a political, religious, philosophical or ideological

7   message falls under the protection of the First Amendment."  *ACLU of Nev. v. City of Las*

8   *Vegas*, 333 F.3d 1092, 1107 (9th Cir. 2003) (quoting *Gaudiya Vaishnava Soc'y*, 952 F.2d at

9   1063); *see also Perry v. Los Angeles Police Dept.*, 121 F.3d 1365, 1368 (9th Cir. 1997).

10  "[A]n expressive item does not lose its constitutional protections because it is sold rather than

11  given away."  *Gaudiya Vaishnava Soc'y*, 952 F.2d at 1063 (citing *City of Lakewood v. Plain*

12  *Dealer Pub. Co.*, 486 U.S. 750, 756 n.5 (1988)).

13        Frazier's t-shirts constitute core political speech under this precedent.  Messages such

14  as "Bush Lied – They Died" obviously critique the initiation and administration of the war

15  in Iraq, perhaps the most salient and hotly debated issue in current American politics.  The

16  record, moreover, makes clear that Frazier is at least substantially motivated by political

17  considerations in creating and selling the t-shirts.  He is a long-time peace activist and

18  opponent of the current war who donates a portion of his proceeds to an organization that

19  provides support to the families of fallen soldiers.  The mere fact that Frazier sells the t-shirts

20  does not transform them into less-protected commercial speech.  *Gaudiya Vaishnava Soc'y*,

21  952 F.2d at 1063.

22        The content of Frazier's online advertising for the t-shirts is also inextricably

23  intertwined with political speech and therefore receives the highest level of constitutional

24  protection.  The advertising has a significant commercial element, but it cannot be said that

25  it lacks a substantial informative and persuasive purpose.  *Village of Schaumburg*, 444 U.S.

26  at 632.  Frazier advertises his t-shirts not only to earn a living through sales, but also to

27  promote the messages that the t-shirts bear.  Taken as a whole and in context, the t-shirt

28  advertisements do more than simply "propose a commercial transaction."  *Bolger*, 463 U.S.

at 66.  They inform consumers about the identity and number of soldiers who have died in Iraq and provide information and opinions about the war.  In purposefully facilitating the dissemination of Frazier's political views, the advertising takes on its own political character.

The State cites to *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), and *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469 (1989), for the proposition that the advertisements constitute commercial speech notwithstanding their noncommercial characteristics.  The issue in *Bolger* was whether a statute that prohibited the unsolicited mailing of advertisements for contraceptives was unconstitutional as applied to a company that mailed "informational pamphlets discussing the desirability and availability of prophylactics in general or [the company's] products in particular."  463 U.S. at 62.  *Bolger* held that the pamphlets constituted commercial speech "notwithstanding the fact that they contain discussions of important public issues" because they advertised the company's product and were mailed for a business purpose.  *Id.* at 67–68.  The advertisements' attempt to "link [the] product to a current public debate" in an effort to boost sales was not enough to transform them into political speech.  *Id.* at 68 (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 n.5 (1980)).

The issue in the second case, *Fox*, was whether a restriction on private commercial enterprises on college campuses was unconstitutional as applied to a company that sold housewares via "Tupperware parties" in college dormitories.  Although the product presentations touched on subjects such as financial responsibility and home economics, they were commercial in nature because the commercial and noncommercial aspects of the presentations were readily separable; the housewares could have easily been sold without teaching on the noncommercial topics.  492 U.S. at 474.

*Bolger* and *Fox* involved speech that was not substantially motivated by or intertwined with the speaker's political message.  In both, the political aspect of the speech was merely tangential to a predominant commercial purpose.  The companies referenced issues of public concern merely as a tactic for promoting their products; their products were not a means of political expression, for them or their customers.  By contrast, Frazier's product is his

1   medium, and his customers'.  The political and commercial dimensions of the speech cannot
2   be separated because the mode of expression has a cost.

3              **2.  The Restrictions Imposed by A.R.S. § 13-3726 are Content-Based**

4          The State next argues for a more deferential form of constitutional review on the
5   ground that A.R.S. § 13-3726 is a content-neutral regulation of the time, place, or manner of
6   Frazier's speech.  This argument is easily rejected because the law is not content-neutral.
7   "[C]ontent-neutral speech restrictions [are] those that are justified without reference to the
8   content of the regulated speech."  *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)
9   (internal quotation marks and emphasis omitted) (quoting *Va. Pharmacy Bd. v. Va. Citizens
10  Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)).  A simple test for this asks whether a law
11  enforcement officer must know what the speaker said in order to invoke the restriction.  If the
12  officer is unable to enforce the restriction without that knowledge, the restriction is
13  necessarily content-based.  *See Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d
14  814, 820 (9th Cir. 1996).  Under this test, section 13-3726 imposes a content-based restriction
15  because a police officer first would have to know that Frazier is utilizing the names of
16  deceased soldiers in order to enforce the law against him.  Frazier's words, rather than the
17  mode of their expression, would be the basis for prosecution.

18         The State conflates content-based restrictions and viewpoint-based restrictions in
19  arguing that the statute is content-neutral because it applies equally to antiwar and pro-war
20  messages.  "A viewpoint-based law goes beyond mere content-based discrimination and
21  regulates speech based upon agreement or disagreement with the particular position the
22  speaker wishes to express."  1 RODNEY A. SMOLLA, SMOLLA & NIMMER ON FREEDOM OF
23  SPEECH § 3:9 (1996).  Because viewpoint-based restrictions are a "subset of content
24  discrimination," a law can be content-based without also discriminating on the basis of
25  viewpoint.  *Id.*  Thus, section 13-3726 is content-based even though it does not by its terms
26  favor a pro- or anti-war message.  *See also Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002,
27  1009 (9th Cir. 2003) ("'[The] First Amendment's hostility to content-based regulation' applies
28

1  even where the regulation 'does not favor either side of a political controversy.'") (quoting

2  *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537 (1980)).

3      The effect of section 13-3726's focus on content is that the law is not a time, place, or

4  manner restriction at all.  *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95

5  F.3d 959, 971 (10th Cir. 1996) (citing *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989))

6  ("Restrictions on the words . . . that may be used by a speaker . . . are quite different than

7  restrictions on the time, place, and manner of speech."); 1 SMOLLA & NIMMER ON FREEDOM

8  OF SPEECH § 8:36 (explaining that time, place, or manner regulations "do not regulate *what*

9  is said, but merely such matters as *when*, *where*, and *how loud*").  The law is not directly a

10  categorical ban on speech because it permits Frazier to use the names of the deceased soldiers

11  if he obtains consent from each soldier's family.  However, the transaction costs involved in

12  obtaining consent from the designated family member of each soldier make the restriction

13  effectively indistinguishable from a flat prohibition.  Given the difficulty and cost of finding,

14  contacting, and obtaining consent from the soldiers' numerous representatives, the time when

15  Frazier may use the names is effectively never, the place is nowhere, the manner is nohow.

16      **3.    Enforcement of A.R.S. § 13-3726 Against Frazier Would not Survive
            Strict Scrutiny**

17

18      Because the State's interpretation of section 13-3726 would result in a content-based

19  restriction on Frazier's political speech, the statute's enforcement would have to be "necessary

20  to serve a compelling state interest and . . . narrowly drawn to achieve that end."  *Foti v. City

21  of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (quoting *Perry Educ. Ass'n v. Perry Local

22  Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  Having chosen to defend the application of the

23  statute exclusively on the grounds that Frazier's t-shirts and advertisements are commercial

24  speech and that the restriction would pertain to time, place, or manner, the State does not

25  argue that the statute meets strict scrutiny.  However, it does contend that the following three

26  purposes justify the law under the more deferential scrutiny that is applied to restrictions on

27  commercial speech and restrictions on time, place, and manner:  (1) "to establish by statute

28  a soldier or soldier's family's common-law right to publicity and thus to prevent a third

person from profiting without consent from that soldier's name or likeness," (2) "to prevent a misleading impression that a soldier has endorsed a particular point of view when he or she has not," and (3) "to protect military families in mourning for their sons and daughters killed in the war."  For the sake of completeness, the court will consider whether application of section 13-3726 to the sale and advertising of Frazier's t-shirts would survive strict scrutiny on any of these grounds.

<strong>a.</strong>    <strong>The Right of Publicity does not Justify Enforcement of A.R.S. § 13-3726 Against Frazier</strong>

The common law right of publicity provides, "One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46 (1995).  A person's name is used "for the purposes of trade" if it is used in "advertising the user's goods or services, or [is] placed on merchandise marketed by the user, or [is] used in connection with services rendered by the user." *Id.* at § 47.  Use for "purposes of trade," however, "does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.*

Recognizing that there is an "inherent tension between the protection of an individual's right to control the use of his likeness and the constitutional guarantee of free dissemination of ideas, images, and newsworthy matter in whatever form it takes," *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 88 (2d Cir. 1989), First Amendment challenges to the right of publicity are evaluated by "balanc[ing] the magnitude of restricting the expression at issue against the asserted governmental interest in protecting the right of publicity." *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 443 F. Supp. 2d 1077, 1096 (E.D. Mo. 2006) (internal quotation marks omitted) (citing *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996)).  The right of publicity can warrant content-based restrictions on commercial speech. *See Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000).  However, the right of publicity cannot

1  justify content-based restrictions on political or artistic expression where the identity of the

2  holder of the right bears a reasonable relationship to the message.  *See Hoffman v. Capital*

3  *Cities/ABC, Inc.*, 255 F.3d 1180, 1185–86 (9th Cir. 2001); *Cher v. Forum Int'l, Ltd.*, 692 F.2d

4  634, 638 (9th Cir. 1982); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 937–38 (6th Cir.

5  2003); *C.B.C. Distrib. & Mktg, Inc.*, 443 F. Supp. 2d at 1092; *Tellado v. Time-Life Books,*

6  *Inc.*, 643 F. Supp. 904, 914 (D. N.J. 1986); *Hicks v. Casablanca Records*, 464 F. Supp. 426,

7  431–33 (S.D.N.Y. 1978); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 872, 603

8  P.2d 454, 462, 160 Cal.Rptr. 352, 360 (1979); *Paulsen v. Personality Posters, Inc.*, 59

9  Misc.2d 444, 299 N.Y.S.2d 501, 508–09 (Sup. Ct. 1968); 2 J. THOMAS MCCARTHY, RIGHTS

10  OF PUBLICITY AND PRIVACY § 8:91 (2d ed. 2007).   The rationale for this rule is that

11  right-of-publicity-based limitations on political and other core forms of protected speech

12  would block important avenues of self-expression and unduly restrict the marketplace of

13  ideas.  *See Guglielmi*, 25 Cal.3d at 872, 603 P.2d at 462, 160 Cal.Rptr. at 360.

14       The foregoing cases make clear that protection of the right of publicity, whatever the

15  scope of the right under state law, cannot be a compelling state interest that overrides Frazier's

16  fundamental right to political speech on the facts of this case.   As explained above, the

17  restriction is content-based, and Frazier's sale and advertising of the t-shirts constitute

18  political speech on a controversial issue.  Because a focal point of Frazier's critique of the Iraq

19  war is the magnitude of the personal loss that it has produced, the individual identities of the

20  deceased American soldiers are not only reasonably related to his message, but integral to it.

21  The t-shirts, like the Vietnam War Memorial, derive some of their communicative force from

22  their ability to personalize human loss on a great scale.   Without the large number of real

23  names of fallen soldiers, the effect of Frazier's political message would be diminished.

24       Moreover, even assuming that the right of publicity could justify content-based

25  restrictions of political speech in some circumstances, it cannot do so in this case because the

26  application of section 13-3726 to Frazier would not be narrowly tailored to serving the right's

27  underlying purposes. The State's expressed reason for creating the soldiers' right of publicity

28  is to "prevent a third person from profiting without consent from [a] soldier's name or

likeness."  The State apparently aims to prevent the unauthorized use of a soldier's identity principally because it unjustly deprives him or her of potential financial gain.  *See Lugosi v. Universal Pictures*, 25 Cal.3d 813, 835–36, 603 P.2d 425, 438–439, 160 Cal. Rptr. 323, 336–337 (1979) (explaining that this is the "gravamen of the harm" flowing from an unauthorized use of an individual's likeness (citing *Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 (9th Cir. 1974))).  The financial deprivation that the right of publicity traditionally seeks to prevent may occur in a variety of contexts.  It can occur because the unauthorized use interferes with the business affairs of the right-holder by disrupting her control her public image.  *Id.* at 835, 603 P.2d at 438, 160 Cal. Rptr. at 336. It may occur because the unauthorized user has flooded the market with the image or name of the right-holder and thereby diminished the value of her commercial endorsements.  *Id. See also Cardtoons, L.C.*, 95 F.3d at 974–75.  The traditional counterpart to these harms is that an unauthorized use unjustly enriches the user, who profits from another's hard-won fame without making any contribution of his own.  *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576 (1977).

Application of section 13-3726 to Frazier would not serve any of these interests.  There is no reason to believe that Frazier's advertising disrupts the business affairs of the deceased soldiers or their family members.  Unlike athletes, movie stars, and other celebrities to whom the right of publicity is most frequently applied and for whom income is often substantially reliant on the commercial value of an identity, the soldiers did not earn their living from their names.  They did not invest time and effort cultivating an identity that was itself a source of financial reward.  The right of publicity loses much of its economic justification where the business affairs of the individuals asserting the right are wholly unrelated to the maintenance of a public persona and wholly unaffected by another's use of that persona.  *See Lugosi*, 25 Cal.3d at 835, 603 P.2d at 438, 160 Cal. Rptr. at 336.  Of course, a soldier whose identity carried some commercial value could be protected against commercial exploitation by this statute or by the common law.

1    The justification for enforcing a right of publicity against Frazier is particularly weak
2  because Frazier is not really profiting off the name of any particular deceased soldier.  The
3  primary selling point of the t-shirts is their critique of the Iraq war through a personalization
4  of the quantum of loss it has brought.  Only a few individual names are actually visible in the
5  advertisement on CarryaBigSticker.com, and the names of the individual soldiers are printed
6  on the t-shirts in a font that cannot be read beyond arm's length.  The identity of any particular
7  soldier is not the point of the t-shirts; it is the combined effect of all the names of the 3,461
8  deceased soldiers.  Frazier's utilization of their identities is intertwined so substantially with
9  his own creative contributions as to dispel any conclusion that he is unjustly enriching himself
10  at the soldiers' expense.  *Cf. ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 938 (6th Cir.
11  2003) (denying a right-of-publicity claim where an individual marketed a product that "added
12  a significant creative component of his own" to a celebrity's identity).

13    Other justifications for favoring a right of publicity over free speech rights are similarly
14  inapplicable.  The right is at times justified on the ground that it is necessary to protect the
15  personal dignity of the right-holder, *see* RESTATEMENT (THIRD) OF UNFAIR COMPETITION §
16  46 at cmt. c, but Frazier's advertising does not disclose any new, private, sensitive, or
17  demeaning facts pertaining to the deceased soldiers.  The individual losses that Frazier
18  describes have already been documented extensively by the commercial news media.
19  CarryaBigSticker.com notes the deaths as an historic fact.  Messages such as "Bush Lied –
20  They Died" cannot reasonably be read to suggest any criticism of the soldiers themselves.

21    The right of publicity is also occasionally justified on the theory that, like copyright
22  and patent protection, it "provides an incentive for creativity and achievement" that benefits
23  society as a whole.  *Cardtoons, L.C.*, 95 F.3d at 973 (citing *Zacchini*, 433 at 576–77).  Under
24  this theory, "publicity rights induce people to expend the time, effort, and resources to
25  develop the talents prerequisite to public recognition" by preserving their ability to profit from
26  that recognition.  *Id.*  Publicity rights for deceased soldiers, however, could have only the
27  most marginal effect on people's decisions to serve in the military.

28

The Attorney General argues that, like a celebrity, a soldier has "value wrapped up in his or her identity or name or likeness" and therefore may be given a right to veto use of that identity without payment. (Prelim. Inj. Hr'g Tr. 94–95.) This tracks the Attorney General's brief, which claims a legislative power "to prevent a third person from profiting without consent from the soldier's name or likeness." The State no doubt has such power in general, but not as an absolute and not to the point of prevailing over core political speech rights. The State cannot give anyone a right of commercial exaction for the exercise of someone else's First Amendment rights. The Nation's debt to its fallen soldiers may not be paid by giving their families a toll on free speech. The debt must be paid, but in other ways.

> **b.** **Enforcement of A.R.S. § 13-3726 Against Frazier Would not Serve the State's Interest in Preventing Misleading Advertising**

The State's second asserted justification for enforcing section 13-3726 against Frazier is that enforcement is necessary "to prevent a misleading impression that a soldier has endorsed a particular point of view when he or she has not." This justification need not be addressed at length because there is no credible risk of misunderstanding in this case. CarryaBigSticker.com neutrally describes the t-shirts as "Anti-War T-Shirts featuring the names of 3,461 troops who died in Iraq." There is no suggestion that the troops endorse the opinions expressed.

> **c.** **Enforcement of A.R.S. § 13-3726 Against Frazier Would not be a Narrowly Tailored Means of Promoting the State's Interest in Protecting Mourning Military Families**

The State's final justification is that section 13-3726 is necessary "to protect military families in mourning for their sons and daughters killed in the war." The State does not argue that this is a "compelling state interest" sufficient to warrant a content-based restriction on political speech, and it is "firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969) (citing *Cox v. Louisiana*, 379 U.S. 536, 546–552 (1965)). The court need not address in this case whether that interest might be compelling in limited circumstances where the speech is malicious or the effect on

1  those who have lost loved ones in combat is likely to be gratuitous and severe.  It is accepted,
2  for example, that one who intentionally inflicts emotional distress upon another by outrageous
3  conduct may be liable in tort notwithstanding the protections of the First Amendment.
4  RESTATEMENT (SECOND) OF TORTS § 46; *see also Hustler Magazine v. Falwell*, 485 U.S. 46,
5  56 (1988) (permitting recovery when emotional distress is intentionally inflicted upon a public
6  figure by speech that involves a "false statement of fact which was made with 'actual
7  malice'").

8      Assuming  that  protection of mourning military families might be a compelling state
9  interest in the right circumstances, the enforcement of section 13-3726 against Frazier would
10  not be narrowly tailored to serve the interest.  The statute is not limited to outrageous conduct
11  or focused on soldiers whose families are grieving.  The prohibition has no temporal
12  constraint, though the State's interest in protecting mourning families must attenuate as they
13  come to terms with their loss.  On the specific facts of this case, there is no evidence or even
14  suggestion that Frazier's conduct is outrageous or likely to cause extreme emotional distress
15  to families in any amount that could strip his speech of First Amendment protection.

16      Even though the State does not contend it would prevail over what is otherwise
17  constitutionally protected free speech, another reality should be acknowledged.  Some
18  families suffer from Frazier's use of the names of deceased soldiers.  On this record, the
19  immediate reason for that distress is left to inference.  It is a fair inference that some families
20  are pained by the conscription of their loved one's name in any proximity to a political
21  opinion which they and their loved one reject.  The hurt may increase from Frazier's implicit
22  contention that their loved one served and sacrificed to no purpose.  Such pain is real.  But we
23  each have our own convictions of the worth of our political values and of the service we
24  choose to give.  In our diverse and democratic society, that worth is not diminished by the
25  disagreement of others.

26      In summary, enforcement of A.R.S. § 13-3726 against Frazier's sale or advertising of
27  the antiwar t-shirts would violate the First Amendment of the United States Constitution.
28  Frazier's activities constitute political speech, and the statutory prohibitions are content-based.

1   The legitimate economic interests underlying the right of publicity cannot justify such
2   restrictions on political speech on the facts of this case.  In any event, enforcement of the
3   statute against Frazier would not serve those interests.  There is no serious risk that viewers
4   of the advertisements or the t-shirts will be mislead to believe that the deceased soldiers or
5   their representatives have endorsed Frazier's political message.  While the State may have a
6   compelling interest in protecting mourning military families in some circumstances,
7   enforcement of 13-3726 against Frazier is not narrowly tailored to serve that interest.  Again,
8   this analysis only addresses the constitutionality of A.R.S. § 13-3726 as applied to Frazier's
9   conduct.

10          **E.      Frazier Has Shown Sufficient Harm for Preliminary Injunction**

11          Because this court has concluded that prosecution of Frazier under the statute would
12   undoubtedly violate his First Amendment rights, it must, according to the law of our circuit,
13   grant his preliminary injunction without balancing the hardship to him and the Defendants.
14   *Faith Ctr. Church Evangelistic Ministries v. Glover*, 462 F.3d at 1202.  However, even if
15   Frazier's constitutional claim on the merits were somewhat less compelling, his evidence of
16   harm and hardship still would meet the test of "probable success on the merits and the
17   possibility of irreparable harm."  *Id.* at 1201–02.

18          The State's newfound ambivalence at the preliminary injunction hearing about the
19   reach of its statute reduces the prospect that Frazier will be prosecuted within the time it
20   would take to decide this case with finality.  However, the uncertainty regarding the scope of
21   the statute is outweighed by the facts that the law was passed specifically for Frazier and that
22   police officers in Flagstaff warned him that they were investigating him for possible
23   prosecution.  At the time he filed this action, Frazier had to choose between discontinuing his
24   sales and the serious possibility of criminal prosecution.  If he is refused an injunction he will
25   be returned to that dilemma.  Either alternative he would face is sufficiently harmful to
26   warrant a preliminary injunction in light of his probability of success.  *Elrod v. Burns*, 427
27   U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of
28   time, unquestionably constitutes irreparable injury.").

1

### F.    Certification of Questions

2      Certification of questions to the Arizona Supreme Court under A.R.S. § 12-1861

3   regarding the meaning of A.R.S. § 13-3726 may be appropriate in this case.  Answers to

4   certified questions could confirm or eliminate the need for First Amendment adjudication.

5   However, no party has suggested certification of questions, and the burden on a state court

6   of last resort from certification weighs against such a request.  The court will call for briefing

7   on whether questions should be certified to the Arizona Supreme Court and how those

8   questions should be cast.

9      The possibility of certification does not eliminate this court's obligation to issue a

10   preliminary injunction.  Even if certification is warranted, the preliminary injunction is

11   required to protect Frazier in the interim.  *See Virginia v. Am. Booksellers Ass'n*, 484 U.S.

12   383, 397 (1988) (noting the importance of staying the enforcement of the challenged state

13   statute to protect First Amendment freedoms while questions of statutory construction were

14   certified to the state's highest court); *Tunick v. Safir*, 209 F.3d 67, 79 (2d Cir. 2000) (citing

15   *Am. Booksellers Ass'n*, 484 U.S. at 397) ("[I]n addition to looking to the length of the delay,

16   courts should also consider whether, pending certification, they can protect the claimed right,

17   perhaps through a stay, without thereby too grievously undermining the state concerns at

18   stake."); *Great Western Shows, Inc. v. Los Angeles County*, 229 F.3d 1258 (9th Cir. 2000)

19   (certifying questions to the California Supreme Court but leaving the district court's

20   preliminary injunction in effect in the interim); *Cate v. Oldham*, 707 F.2d 1176, 1185–90

21   (11th Cir. 1983) (certifying questions to the state supreme court but granting a preliminary

22   injunction to prevent a malicious prosecution action against the plaintiff because of "[t]he

23   strong public interest in protecting First Amendment values.").

24      IT IS THEREFORE ORDERED that Plaintiff's Motion for a Preliminary Injunction

25   (Doc. # 5) is granted.  Plaintiff may lodge a proposed form of preliminary injunction after

26   conferring with the Defendants to determine if a form of order can be agreed upon.

27      IT IS FURTHER ORDERED pursuant to Fed. R. Civ. P. 4(m) that any defendants for

28   whom proof of service has not been filed by October 26, 2007, will be dismissed thereafter

1   for failure to serve process, unless the time for service is extended by court order before  that

2   date.

3          IT IS FURTHER ORDERED that the parties submit briefs on whether questions

4   concerning the meaning of A.R.S. § 13-3726 should be certified to the Arizona Supreme

5   Court and, if so, the formulation of those questions.  Briefs shall be filed by the following

6   dates:

7          –October 17, 2007: Defendants' brief

8          –October 31, 2007: Plaintiff's brief

9          DATED this 27th day of September 2007.

10

11

12                                         Neil V. Wake
                                    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28